In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1663

PRIME EAGLE GROUP LIMITED, as assignee of
the claims of Nakornthai Strip Mill Public
Company Limited,

*Plaintiff-Appellant*,

*v.*

STEEL DYNAMICS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:08 CV 35—**James T. Moody**, *Judge*.

ARGUED OCTOBER 8, 2009—DECIDED JULY 27, 2010

Before EASTERBROOK, *Chief Judge*, and MANION and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Nakornthai Strip Mill Public
Company Limited began building a new steel mini-mill
in Thailand during the 1990s. When the project ran
into technical and financial difficulties, it asked Steel
Dynamics, a firm with expertise in developing and

running steel mini-mills, to lend assistance. Steel Dynamics did so, and it also helped Nakornthai raise capital. The mill was started and seemingly ran productively. But in late 1998 steel prices were down, the economy of Southeast Asia was in recession, and Steel Dynamics concluded that the venture was going to lose money. It decided to withdraw, lest it become liable for some of these losses. (Steel Dynamics had dispatched a management team that had operational control of the mill.) Prime Eagle Group, which sues as Nakornthai's assignee, contends in this litigation under the international-diversity jurisdiction, see 28 U.S.C. §1332(a)(2), that Steel Dynamics chose fraud as its means of exit and must pay damages in tort. The parties agree that Indiana law supplies the rule of decision.

According to Prime Eagle, the fraud was telling Nakornthai's board of directors and principal investors that the mini-mill had design flaws that would cost about $100 million to fix. When the management team under Steel Dynamics' control began preparations for these changes, major investors pulled the plug. The mill was idle from December 1998 (when it was put out of service by lightning) until it restarted in December 2003. Meanwhile, Nakornthai was reorganized under Thai insolvency law. In June 2002 it commissioned an engineering study, which two months later concluded that the mill's design and construction were sound. The mill has operated successfully since its restart, without the costly changes that Steel Dynamics had said were essential. Prime Eagle believes that Steel Dynamics must pay $1 billion for losses suffered while the mill was idle or

operated at less than capacity, plus the costs of con-ducting the Thai reorganization proceeding.

Prime Eagle filed this suit in 2008, a decade after the supposed fraud. (We have recited the complaint's allega-tions, which may or may not be true.) The statute of limitations in Indiana is six years. Ind. Code §34-11-2-7(4). A claim accrues, and the statute of limitations begins to run, "when a claimant knows or in the exercise of ordinary diligence should have known of the injury." *Cooper Indus-tries, LLC v. South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009).

Steel Dynamics observes that Nakornthai knew of the injury when the mill was closed; Prime Eagle replies that Nakornthai did not know that it had been played false until the consultant's report in 2002. Cf. *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010) (discussing the dis-covery doctrine for federal securities claims). Normally knowledge of who injured you is essential, in addition to knowledge of the injury's existence. See *Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, No. 09-2781 (7th Cir. June 22, 2010), slip op. 8–9. Nakornthai knew the "who" no later than it knew the existence of its injury.

Prime Eagle asks us to treat knowledge of a given per-son's *culpability*, as well as that person's causal role, as an additional element of a claim's accrual. That's a less common element. See *United States v. Kubrick*, 444 U.S. 111, 119–25 (1979). The district judge did not decide whether a claim's accrual is postponed until the victim knows about the defendant's fault, because Nakornthai had actual knowledge on that front no later than September 1998, when its own president wrote the board of di-

rectors a detailed letter disagreeing with Steel Dynamics and concluding that the mill should be restarted as is. The board chose to fire its president instead and cannot maintain that it was ignorant. The court found the suit untimely and entered judgment for Steel Dynamics. 2009 U.S. Dist. LEXIS 13943 (N.D. Ind. Feb. 23, 2009).

Although the parties have filed lengthy briefs covering many subjects, the only one that we need to discuss is whether the president's knowledge is imputed to Nakornthai. If it is, then Nakornthai knew in fall 1998 that Steel Dynamics' assertions were false, or at least questionable enough to justify an investigation. The report commissioned in 2002 could have been commissioned in 1998. (We put to one side the question why Prime Eagle waited 5½ years after Nakornthai received the consultant's report. Legal counsel had to have appreciated that a court might deem the claim to have accrued earlier. Waiting until what is by one's own calculation the tail end of a period of limitations is a formula for disaster.)

Nakornthai's president during 1998 was John Schultes, an engineer who had worked for USX (U.S. Steel) before he joined Nakornthai as President and CEO in October 1995. That was well before Steel Dynamics became involved. No one contends that Schultes was beholden to Steel Dynamics or under its influence. Schultes knew the design of the plant and believed that Steel Dynamics was wrong in asserting that major changes were required. He told the board of directors this in a comprehensive letter. He was fired for his troubles—but his view was

vindicated by the consultant's report in 2002 and the successful restart of the mill in 2003.

Corporations do not have brains, but they do have employees. One fundamental rule of agency law is that corporations "know" what their employees know—at least, what employees know about subjects that are within the scope of their duties. (What a mailroom employee knew, or thought he knew, about the plant's design would not be imputed to Nakornthai.) Schultes knew in 1998 that Steel Dynamics was not giving Nakornthai accurate information; therefore Nakornthai itself knew this. See *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 748 (7th Cir. 1994); William Meade Fletcher, *Cyclopedia of the Law of Corporations* §811 (2010 ed.) ("notice to and knowledge of the president of a corporation relating to its affairs and business is notice to and knowledge of the corporation"). And Nakornthai's injury began (and the claim thus accrued) no later than July 1999, when its investors withdrew their support, left the plant idle, and threw the firm into insolvency.

Prime Eagle says that this is not so, because Schultes was "in an extremely diminished capacity." Presumably this does not mean that he was on the verge of insanity. What Prime Eagle means is that he had lost the board's confidence and was on his way out. But the board has itself to blame. You can't stare the truth in the face, disbelieve it, and then claim to have been ignorant. See *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988) (a truthful written disclosure prevents a claim of reliance on oral deceit). Conflicting assertions (Schultes on one

side, Steel Dynamics on the other) may leave a person in doubt, but there are means to resolve doubt, such as the consultant's report commissioned in 2002. When "ordinary diligence" (see *Cooper Industries*) following a notice would expose the untruth, the plaintiff has all required knowledge.

The common law of agency recognizes only two exceptions to the proposition that an employee's knowledge of a matter within the scope of his duties is imputed to the employer: One is that the employee was acting adversely to the principal's interests, and the other is that the employee was subject to a duty to a third party not to disclose the information to the principal. See *Restatement (Third) of Agency* §5.03 (T.D. 6, 2005). Neither the American Law Institute nor any state's judiciary thinks that there is, or should be, a third exception, for employees who have lost the board's confidence and are soon to be shown the door. If Prime Eagle wanted to argue for the creation of such an exception, it should have sued in state rather than federal court. We must take state law as we find it.

Prime Eagle suggests that, when the reorganization began, and a new set of investors took over (the old bondholders' claims were converted to equity, and new debt capital was raised), Nakornthai effectively "forgot" what the board had been told in 1998. The board members to whom Schultes passed the information were no longer there; Schultes himself was gone. The common law of agency does not provide for corporate forgetfulness, however; information is a corporate asset that does not

vanish when investors elect a new board. A corporation is a continuing entity as the board changes, just as the United States of America is a continuing entity governed by legal texts adopted in 1788 and 1791, even though George Washington is no longer the President and James Madison no longer sits in the House of Representatives. More: if Schultes' report drops out of the picture, then Steel Dynamics' statements do too; it is not possible to adopt a rule that turnover on the board causes selective corporate amnesia.

Prime Eagle argued in the district court that Steel Dynamics is equitably estopped to plead the statute of limitations, but it has not contested on appeal the judge's adverse decision. It does argue for equitable tolling during its insolvency, but it misunderstands the doctrine. Equitable tolling does not *restart* the period of limitations, as Steel Dynamics supposes. Instead it permits deferral of suit until the tolling event ceases and requires diligent action thereafter. See, e.g., *Pace v. DiGuglielmo*, 544 U.S. 408, 418–19 (2005); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990); *Jay E. Hayden Foundation*, slip op. 10–11. Nakornthai was out of bankruptcy, and had its mill running, with at least eight months left in the period of limitations, even on the earliest possible accrual date. (Steel Dynamics contends that the first injury occurred in August 1998.) Nakornthai waited more than four years after the success of its mill put the lie to Steel Dynamics' analysis, and 5½ years after the consultant reported that the mill would run just fine as is. Prime Eagle has been anything but dili-

gent and cannot use equitable tolling to justify the untimely filing.

                                                        AFFIRMED